931 P.2d 641

**Lenore KESSLER, individually, and as Personal Representative of the Estate of Bobbie F. Kessler, deceased, Plaintiff–Appellant,**

v.

**Bob BAROWSKY, Payette County, State of Idaho Department of Law Enforcement, Richard L. Cade, Ronald Moore, David L. Neal, Stephen C. Jones, Michael R. Nauman, David L. Case, and Wayne March, Jr., Defendants–Respondents.**

No. 22969.

Supreme Court of Idaho,
Boise, December 1996 Term.

Jan. 29, 1997.

650

Jim Jones & Associates, Boise, for plaintiff–appellant. Jim Jones argued.

Hamlin & Sasser, Boise, for County defendants–respondents. Ronald D. Christian argued.

Quane, Smith, Howard & Hull, Boise, for State defendants–respondents. Phillip Collaer argued.

JOHNSON, Justice.

This is a wrongful death case arising out of an arrest. We conclude that the trial court incorrectly granted summary judgment dismissing claims for negligent planning and execution of the arrest, and for negligent supervision, and dismissing civil rights claims against state law enforcement officers as individuals. We uphold the trial court's summary judgment dismissing the civil rights claims against the state, the county, and the sheriff, and against the state officers in their official capacities.

## I.

### THE BACKGROUND AND PRIOR PROCEEDINGS

Bobbie Kessler (Bobbie) worked as a reserve deputy for the Payette County sheriff

(the sheriff). Following allegations that Bobbie had sexually assaulted his daughter, the county prosecuting attorney (the prosecutor), contacted the sheriff's office and the Idaho state police crisis response team (CRT). Because Bobbie was employed by the sheriff as a reserve deputy, the prosecutor decided that it would be better procedure for CRT to arrest Bobbie.

Bobbie had extensive martial arts training and had military experience as a member of the special forces. The prosecutor testified that Bobbie's son and daughter told him that Bobbie was dangerous, always carried weapons, and would not be arrested peacefully. The prosecutor also testified that Bobbie's son and daughter told him that Bobbie would kill them if he were arrested. Bobbie's son and daughter deny making this statement. Bobbie's son also denies telling the prosecutor that Bobbie would kill anyone who tried to arrest him.

The prosecutor and a deputy sheriff (the deputy) met with two CRT officers (officers 1 and 2) on December 13, 1992. Officers 1 and 2 later testified that the deputy told them that Bobbie was a dangerous individual, would resist arrest, and usually carried weapons. They said that the deputy gave them a "Rambo" image of Bobbie. Officers 1 and 2 testified that the deputy and the prosecutor took an active role in arranging the arrest. Officer 2 filled out the CRT operation form, stating under the heading "current state of mind," that Bobbie "will not be taken alive—will shoot it out if he had to—will go after whoever causes his arrest—will not live in cage." Officer 2 testified that this information was provided by the deputy.

On the morning of December 14, 1992, CRT met to plan the arrest and adopted the deputy's suggestion of calling Bobbie to work at the sheriff's office. The use of the sheriff's office was approved by the sheriff. CRT decided to arrest Bobbie in the hallway and reception area because the doors would automatically lock behind him.

A CRT captain (the captain) called the state penitentiary to inquire about methods of incapacitating a person. An officer at the penitentiary recommended "Cap-stun," a cayenne pepper spray. Officer 2 and another CRT officer (officer 3) went to the penitentiary to get additional training and to pick up some Cap-stun. At the penitentiary, officers 2 and 3 were shown films on the effects of Cap-stun, and sprayed a short burst into a shower stall.

CRT's plan for Bobbie's arrest (the plan) called for CRT to confront Bobbie in the locked hallway of the sheriff's office, inform him of the arrest, and immediately spray him with Cap-stun. CRT decided that after Bobbie was incapacitated, he could be taken into custody peacefully. The plan provided no alternative in the event the Cap-stun did not incapacitate Bobbie.

CRT met at 6:00 p.m on the day of the planned arrest. There is conflicting testimony concerning what was said at this meeting. The deputy testified that Bobbie's son told the group that Bobbie would "probably go down hard, and you'll have to shoot him." Officer 2 and another CRT officer (officer 4) do not recall Bobbie's son saying anything at the meeting. Officer 1 testified that the deputy told the group that Bobbie was dangerous and that if he got away he would kill his family.

The sheriff's office notified Bobbie to report to duty at approximately 8:10 p.m. on the evening of the planned arrest. As a deputy, Bobbie was required to carry his handgun while on duty. When Bobbie arrived at the sheriff's office, he entered the reception area, and the door was locked behind him. Officer 4 stepped out, pointed a submachine gun at Bobbie's chest and said "State Police, you are under arrest." Officer 4 and the other CRT officers present were dressed in camouflage uniforms. There is conflicting testimony concerning whether Bobbie reached for his gun before he was sprayed with Cap-stun.

After officers 2 and 3 sprayed Bobbie with Cap-stun, Bobbie put his hands up to his face, turned around, and headed for the door. After being unable to open the door, he turned to his left in a crouching position and drew his gun. The CRT officers repeatedly told Bobbie that he was under arrest, that he should lie down, and stated, "don't do it." Bobbie pointed the gun down the hall. Al-

though it was later determined that Bobbie never fired his gun, officer 2 thought he saw a muzzle flash. Another CRT officer (officer 5) fired his weapon, and then other CRT officers also fired their weapons. None of the CRT officers announced to Bobbie that they were intending to shoot. Officers 1 and 5 testified that the CRT officers repeatedly told Bobbie that they were state police. Officers 3 and 4 stated that they did not identify themselves as police after the initial confrontation.

The CRT officers fired two volleys with their weapons. In the first volley, Bobbie was hit in the left shoulder socket and in the right arm and shoulder. There is evidence that Bobbie then rolled to the left. In the second volley Bobbie was hit in his right buttock and in the area of the left hip and buttock. Officer 5, who fired the fatal shot that entered the area of Bobbie's left hip and buttock and travelled upward toward his chest, stated that Bobbie was pointing the gun down the hallway after rolling over. On behalf of herself and Bobbie's estate, Bobbie's wife, Lenore Kessler (Lenore), sued the sheriff, Payette County (the county), the Idaho department of law enforcement (the department), the director of the department (the director), the superintendent of the Idaho state police (the superintendent), the captain, and officers 1, 2, 3, 4, and 5, alleging violations of the Idaho tort claims act (ITCA), I.C. §§ 6–901 through –929, and the federal civil rights act, 42 U.S.C. § 1983 (§ 1983). (All of those sued are hereafter referred to collectively as "the defendants." The director, the superintendent, the captain, and officers 1, 2, 3, 4, and 5 are hereafter referred to collectively as "the state officers.")

In response to motions for summary judgment by the defendants, Lenore filed an affidavit of a law enforcement expert (Lenore's expert), which contained opinions that the plan was flawed, that CRT continued to use deadly force when it was no longer objectively reasonable, and that the probable cause of Bobbie's death was:

a. The hyperbole describing his supposed danger and the consequent unreasonable fear of him;

b. The tactics used by the police officers that foreseeably escalated their confrontation of him;

c. The improper use of Cap–Stun with which they were neither trained nor experienced; and

d. Continuing to shoot him after he was no longer a threat to them.

The trial court denied defense motions to strike the affidavit of Lenore's expert, but granted summary judgment dismissing Lenore's complaint. Lenore appealed. This Court assigned the case to the Court of Appeals, which affirmed. This Court granted review at Lenore's request.

## II.

## THE TRIAL COURT CORRECTLY REFUSED TO STRIKE SOME PORTIONS OF THE AFFIDAVIT OF LENORE'S EXPERT, BUT SHOULD HAVE STRICKEN THREE PORTIONS.

As a preliminary matter, we address the assertion of the defendants that the trial court should have stricken the affidavit of Lenore's expert (the expert's affidavit). We conclude that the trial court correctly refused to strike some portions of the expert's affidavit, but should have stricken three portions.

The defendants asked the trial court to strike three paragraphs of the expert's affidavit pursuant to I.R.C.P. 56(e) on the ground that these portions are inadmissible as evidence. The defendants also contend that Lenore's expert is not competent to testify and that there is no foundation for the opinions contained in the affidavit.

Lenore's expert was the chief of police for Bellevue, Washington for ten years, and had a total of twenty-nine years of continuous police service. He has been a recognized police expert in more than 400 cases. Prior to the preparation of his affidavit, Lenore's expert reviewed many documents related to the present case, including the affidavits and depositions of officers 1, 2, 3, 4, and 5, the director, the superintendent, as well as the deposition of the deputy and the affidavits of the prosecutor and the sheriff.

■ The county contends that the opinion of Lenore's expert that Bobbie's arrest was a joint operation between the department and the county does not qualify as an expert opinion. We conclude that pursuant to I.R.E. 702 this is an expert opinion. Lenore's expert is qualified by knowledge and experience to assist the trier of fact with specialized knowledge on this subject.

■ The county also contends that Lenore's expert had no foundation for his opinion that the county officers unreasonably portrayed Bobbie "as being of superhuman danger." We conclude that the material the expert reviewed and his qualifications as a law enforcement expert provide a sufficient foundation for his expert opinion on police procedures, including the assessment of dangers.

■ The department contends that two portions of the affidavit of Lenore's expert should be stricken because there was no foundation for his statements concerning the reaction of a Vietnam combat veteran or former military personnel with combat experience to an arrest like the one in this case. The affidavit of Lenore's expert does not contain any foundation for his expertise in these areas, nor does it contain evidence of his expertise in psychology. Therefore, these two statements are inadmissible, and the trial court should have stricken them.

■ In stating his opinion that the plan for taking Bobbie into custody was so tactically flawed that the adverse outcome was more probable than not, Lenore's expert stated that he considered several facts, including the reactions of a Vietnam combat veteran or former military personnel with combat experience. We conclude that it is unclear whether Lenore's expert would have given the same opinion without considering this information. Therefore, this opinion should also be stricken.

■ The department contends that the opinion of Lenore's expert that the police officers continued to use deadly force when it was no longer objectively reasonable to do so and thereby caused Bobbie's death is conclusory, speculative, and not based on facts in the record. We conclude that Lenore's expert referred to sufficient facts contained in the record regarding the injuries sustained by Bobbie to provide a foundation for the admissibility of his opinion. Foremost among these facts are the following:

a. He had been hit by three non fatal shots in his left and right shoulders while he was turning to face or was facing the police officers;

b. After he had fallen from the impact of those shots with his head toward the door and his feet toward the shooters so as to be FACING AWAY FROM THEM, (emphasis supplied [by Lenore's expert]) he was shot twice more from behind;

c. The fatal shot entered his left hip/buttock while he was prone and continued through his long axis to penetrate his chest while still another shot went through his right buttock at a similar angle;

d. Additionally, there are four shots to the floor in front of him and two shots to the floor behind him that more probably than not were fired after he went down;

e. This physical evidence clearly shows that the police officers continued to shoot at him after he had turned and dropped face down from their initial volley of shots.

### III.

### THE TRIAL COURT INCORRECTLY GRANTED SUMMARY JUDGMENT DISMISSING THE CLAIMS FOR NEGLIGENT PLANNING, NEGLIGENT EXECUTION, AND NEGLIGENT SUPERVISION.

Lenore asserts that the trial court should not have granted summary judgment dismissing her claims for negligently planning the arrest (the negligent planning claim), for negligently executing the arrest (the negligent execution claim), and for negligence in failing to properly train, deploy, supervise, and control the CRT officers who arrested Bobbie (the negligent supervision claim). We agree.

■ We first note that Lenore's negligence claims are not foreclosed by the exception to ITCA liability contained in I.C. § 6-904(3), which provides:

A governmental entity and its employees while acting within the course and scope of their employment and without malice or criminal intent shall not be liable for any claim which: ... [a]rises out of assault, battery....

I.C. § 6–904(3).

In *Doe v. Durtschi*, 110 Idaho 466, 716 P.2d 1238 (1986), the Court dealt with the distinction between the claims for negligence and for assault and battery:

> There is a distinction between the conduct which forms the basis of a cause of action in negligence and one for assault and battery. A cause of action in negligence requires the breach of a duty which is the proximate cause of the plaintiff's injury. A battery, on the other hand, requires intentional bodily contact which is either harmful or offensive.

*Id.* at 471, 716 P.2d at 1243 (citations omitted).

In *Durtschi*, the Court ruled that a school district was not immune from liability under this exception to ITCA liability when children sustained injuries from being molested by a teacher who the school district had knowledge 'had committed previous sexual abuse. The Court stated:

> In order to withstand dismissal under the intentional tort exception to the ITCA, a plaintiff must allege sufficient facts which, if proven, would demonstrate that the governmental entity should have reasonably anticipated that one of their employees would commit an intentional tort.

*Id.* at 473, 716 P.2d at 1245.

By its decision in *Durtschi*, the Court rejected the contention that ITCA does not contemplate a claim of negligence in failing to prevent a loss caused by a battery. The history of the contrary view held by some members of the Court can be found in Justice Shepard's dissent in *Kifer v. School Dist. No. 394*, 100 Idaho 411, 412–13, 599 P.2d 302, 303–4 (1979) and in the dissents of Justices Shepard and Bakes in *Durtschi*, 110 Idaho at 479–87, 716 P.2d at 1251–59.

■ Before evaluating the evidence presented concerning Lenore's negligence claims, we first state the applicable law.

When making an arrest, a police officer must not subject the person being arrested to any more force or restraint than is necessary. *Anderson v. Foster*, 73 Idaho 340, 345, 252 P.2d 199, 202 (1953). It necessarily follows that in planning an arrest, a police officer has the duty to plan to use no more force than is necessary.

From *Durtschi*, it necessarily follows that the rule to be applied to the negligent supervision claim is that Lenore must present evidence to raise a genuine issue of material fact concerning whether those who had the duty to supervise should have reasonably anticipated that those subject to their supervision would commit a battery.

With these rules in mind, we turn then to an evaluation of the evidence presented in connection with the defendants' motions for summary judgment to determine whether there are any genuine issues of material fact that preclude summary judgment. In doing so, we apply the standards admirably stated in *Anderson v. City of Pocatello*, 112 Idaho 176, 731 P.2d 171 (1987), a case in which there were claims based on the shooting of an individual by two police officers. There the Court said that the standards applicable to summary judgment motions

> require the district court, and this Court upon review, to liberally construe the facts in the existing record in favor of the nonmoving party, and to draw all reasonable inferences from the record in favor of the nonmoving party. In this process the Court must look to the "totality of the motions, affidavits, depositions, pleadings, and attached exhibits," not merely to portions of the record in isolation. Circumstantial evidence can create a genuine issue of material fact. "[A]ll doubts are to be resolved against the moving party." The motion must be denied "if the evidence is such that conflicting inferences can be drawn therefrom and if reasonable [people] might reach different conclusions."

*Id.* at 179–80, 731 P.2d at 174–75 (citations omitted).

According to Lenore's expert, arrests of armed and dangerous suspects are not un-

usual, and "are routinely made by confronting the suspect with such overwhelming force that he has no choice but to submit." The arrest plan made certain that Bobbie would be armed at the time of the arrest and provided that the CRT officers would not be attired in traditional law enforcement uniforms, but would be dressed in camouflage. As specified in the plan, officer 4 pointed a loaded submachine gun at Bobbie's chest and informed Bobbie that he was under arrest. Officers 2 and 3 immediately intervened to spray Bobbie with the Cap-stun. Lenore's expert states that officers 2 and 3 had inadequate training in the use of the Cap-stun.

■ Construing the totality of the evidence most favorably to Lenore leads to conflicting inferences concerning whether the officers should have known that Bobbie would react defensively after being sprayed with Cap-stun, become disoriented, use his weapon to defend himself, and be killed as a result. A reasonable person might conclude that the officers should have anticipated this result. Therefore, there are genuine issues of material fact concerning whether the plan called for the use of excessive force and whether the execution of the plan caused Bobbie's death.

■ Lenore's expert stated that the captain and officers 2 and 3 were not adequately trained in the use of Cap-stun. Applying the standard established in *Durtschi* for determining whether summary judgment should have been granted dismissing the negligent supervision claim, we conclude that conflicting inferences can be drawn from this evidence concerning whether the director, the superintendent and the captain should have reasonably anticipated that CRT would shoot Bobbie as a result of the plan and the execution of the plan. We conclude that a reasonable person could conclude that they should have. Therefore, the trial court was incorrect in granting summary judgment dismissing the negligent supervision claim.

■ Concerning summary judgment dismissing the negligence claims against the sheriff and the county, we note that the captain stated that the sheriff, the deputy, and the prosecutor provided information about Bobbie and the physical layout of the jail and courthouse facilities during the formulation of the arrest plan. The captain stated that the sheriff and the deputy were present when the arrest plan was formulated, were advised of the plan, and did not voice any objection to the plan. Construing this evidence and the opinion of Lenore's expert that the arrest was a joint operation most favorably to Lenore, conflicting inferences might be drawn whether the sheriff and the county were involved in the formulation of the arrest plan. A reasonable person could conclude that they were. Therefore, there is a genuine issue of material fact concerning whether the sheriff and the county were responsible for any negligence in planning the arrest.

## IV.

## THE CIVIL RIGHTS CLAIMS WERE PROPERLY DISMISSED, EXCEPT THOSE AGAINST THE STATE OFFICERS AS INDIVIDUALS.

Lenore asserts that the trial court should not have dismissed her civil rights § 1983 claims. We agree concerning the claims against the officers as individuals, but disagree concerning the claims against the county, the state, and the state officers and the sheriff in their official capacities.

■ The state of Idaho is not a "person" for purposes of § 1983. *Arnzen v. State,* 123 Idaho 899, 903, 854 P.2d 242, 246 (1993), *cert. denied,* 510 U.S. 1071, 114 S.Ct. 877, 127 L.Ed.2d 73 (1994). A suit against a state official acting in an official capacity is nothing more than a suit against the state, and state officials acting in their official capacity are not "persons" under § 1983. *Id.* at 903–04, 854 P.2d at 246–47. Therefore, the trial court was correct in dismissing the § 1983 claims against the state and the state officers in their official capacities.

■ Although municipalities, other units of local government, and their officials sued in their official capacity, are "persons," they are liable under § 1983 only for injuries inflicted pursuant to policy or custom. *Monell v. Dep't of Social Services of City of*

*N.Y.*, 436 U.S. 658, 691–92, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978). Proof of a single incident standing alone cannot sustain a finding of municipal or local governmental liability under § 1983, unless there is proof that the incident was caused by an existing unconstitutional policy. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791, *reh. denied*, 473 U.S. 925, 106 S.Ct. 16, 87 L.Ed.2d 695 (1985). In *Anderson*, the Court determined that a single incident by itself is not enough to support an inference that the city had an official policy or procedure that led to the plaintiff's injuries. 112 Idaho at 186, 731 P.2d at 181. Lenore did not present evidence of other incidents of excessive force by CRT. Therefore, the trial court was correct in dismissing the § 1983 claims against the county and the sheriff in his official capacity.

Although Lenore did not expressly sue the officers in their individual capacities, the complaint implies that the § 1983 claims are against the officers as individuals because Lenore seeks damages for their actions. *See Price v. Akaka*, 928 F.2d 824, 828 (9th Cir. 1991). Therefore, we must determine whether there are genuine issues of material fact concerning these § 1983 claims against the state officers and the sheriff.

■ In a § 1983 suit, the claimant must prove a violation of the underlying constitutional right. *See Daniels v. Williams*, 474 U.S. 327, 330, 106 S.Ct. 662, 664, 88 L.Ed.2d 662 (1986). The U.S. Supreme Court has ruled that "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest ... should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' [Fourteenth Amendment] approach." *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989) (emphasis in original); *see also Grant v. City of Twin Falls*, 120 Idaho 69, 813 P.2d 880 (1991).

■ In determining whether the force used in effectuating an arrest is reasonable under the Fourth Amendment, the Court must balance the nature and quality of the intrusion of the individual's Fourth Amendment rights against the governmental interests. *Graham*, 490 U.S. at 396, 109 S.Ct. at 1871. The factors we must examine when making this analysis are: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to police or others, and (3) whether the suspect is actively resisting arrest or attempting to flee. *Id.* at 396, 109 S.Ct. at 1871. "The 'reasonableness' of a particular use of force must be judged objectively from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396, 109 S.Ct. at 1872.

■ A person has a constitutional right not to be subjected to excessive force by police officers. *Sprague v. City of Burley*, 109 Idaho 656, 710 P.2d 566 (1985). Whether the force was proper or improper is determined by looking at "the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously or sadistically for the very purpose of causing harm." *Id.* at 668, 710 P.2d at 579 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.1973) *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)).

■ In situations involving peaceful arrests, this Court has stated that a person can not use force or a weapon in resisting an arrest if the person has reasonable grounds to believe the person is being arrested by a police officer. *State v. Richardson*, 95 Idaho 446, 451, 511 P.2d 263, 268 (1973), *cert. denied*, 414 U.S. 1163, 94 S.Ct. 928, 39 L.Ed.2d 117 (1974).

> [I]f the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

*Tennessee v. Garner*, 471 U.S. 1, 11–12, 105 S.Ct. 1694, 1701, 85 L.Ed.2d 1 (1985).

■ The evidence submitted in connection with the motions for summary judgment

shows that Bobbie was sprayed with one and a half cans of Cap-stun, enough, according to CRT, to "bring God down," and that Cap-stun leads to difficulty in breathing which results in panic and disorientation. The evidence also contains the statement of a person who had been sprayed with Cap-stun, who said, "[i]t was like being hit with a bat, it completely eliminated 38 years of martial arts training." Officers 1, 2, 3, and 4 stated that Bobbie brought his hands to his face after being sprayed with Cap-stun. From this evidence, conflicting inferences can be drawn concerning whether the Cap-stun affected Bobbie's thoughts and actions. A reasonable person could conclude that it did. A reasonable person could also conclude that Bobbie pulled his gun in self-defense after being confronted by camouflaged men holding a submachine gun at his chest and spraying him with Cap-stun in a locked hallway. Therefore, there is a genuine issue of material fact concerning whether the use of the Cap-stun caused Bobbie's reaction and unnecessarily escalated the situation, leading to Bobbie's death. Lenore's expert states that the "physical evidence clearly shows that the police officers continued to shoot at [Bobbie] after he had turned and dropped face down from their initial volley of shots." One of the reasonable inferences that can be drawn from this evidence is that Bobbie was not pointing his gun at the officers when he was shot in the area of his left hip and buttock, with the bullet travelling upward toward his chest. Therefore, although it may not have been excessive to use deadly force after Bobbie pulled out his gun, there is a genuine issue of material fact whether it was excessive to begin a second volley of shots after Bobbie was hit and lying on the floor.

▆▆▆ "[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989). This Court has held that summary judgment is proper when a plaintiff fails to refute a police chief's affidavit claiming adequate training. *Sprague,* 109 Idaho at 661, 710 P.2d at 571. Lenore's expert stated that the captain and officers 2 and 3 were not adequately trained in the use of Cap-stun. Construing this evidence most favorably to Lenore, conflicting inferences could be drawn and a reasonable person could conclude that these officers did not have adequate training in the use of Cap-stun and that this lack of training contributed to Bobbie's death.

▆▆▆ Because the sheriff did not personally participate in the arrest and because there is no evidence of the sheriff's responsibility to train or supervise CRT, it was correct for the trial court to grant summary judgment in the sheriff's favor on the § 1983 claim.

▆▆▆ The state officers contend that they have qualified immunity from § 1983 liability. In *Arnzen v. State,* 123 Idaho 899, 854 P.2d 242 (1993), the Court stated the tests to determine if an individual defendant in a § 1983 case is entitled to the defense of qualified immunity. These include (1) whether there was a clearly established right, (2) whether the individual defendant's conduct violated the clearly established right, and (3) whether a reasonably competent public official would have known of the right. *Id.* at 904-5, 854 P.2d at 247-48. At the time of Bobbie's arrest there was a clearly established right to be free from excessive force when arrested and that a reasonably competent public official would have known of the right. A reasonable inference can be drawn from the evidence that the CRT officers violated this right. Therefore, there is a genuine issue of material fact whether the state officers violated this right, and qualified immunity is not a basis upon which we can sustain summary judgment in favor of the state officers.

## V.

## CONCLUSION

We affirm the summary judgment dismissing the § 1983 claims, except those against the state officers as individuals.

We vacate the summary judgment dismissing the negligence claims and dismissing the

§ 1983 claims against the state officers as individuals.

We remand the case to the trial court for further proceedings.

We award Lenore costs on appeal.

McDEVITT, C.J., and TROUT, SILAK, and SCHROEDER, JJ., concur.