# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 42053-2014

| | | |
|---|---|---|
| MELENE JAMES, | ) | |
| | ) | Boise, April 2015 Term |
| Plaintiff-Appellant, | ) | |
| | ) | 2016 Opinion No. 36 |
| v. | ) | |
| | ) | Filed: March 23, 2016 |
| CITY OF BOISE, a political subdivision of | ) | |
| the State of Idaho; STEVEN BONAS, | ) | Stephen W. Kenyon, Clerk |
| STEVEN BUTLER, and TIM KUKLA, | ) | |
| | ) | SUBSTITUTE OPINION. THE |
| Defendants-Respondents. | ) | COURT'S PRIOR OPINION |
| | ) | DATED MAY 21, 2015 IS |
| | ) | HEREBY WITHDRAWN. |
| | ) | |

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, in and for Ada County. Hon. Steven J. Hippler, District Judge.

The judgment of the district court is <u>affirmed</u>.

John A. Bush, Comstock & Bush, Boise, argued for appellant.

Kelley K. Fleming, Assistant City Attorney, Boise, argued for respondents.

_____

EISMANN, Justice.

This is an appeal from a judgment dismissing the plaintiff's claims seeking to recover damages resulting from being bitten by a police dog when she was mistaken for a burglar. We affirm the judgment of the district court.

## I.
## Factual Background.

On Sunday, December 26, 2010, at about 5:22 p.m., a citizen made a 911 telephone call to report a breaking and entering at a dental office in Boise. The citizen told the operator that he was at his family's house and heard glass breaking at the dental office across the street. When he went to investigate, he saw a woman about halfway through a window. He stated: "I talked to the lady, and she's trying to get her keys out of the building. She looks like she's, uh, under the

influence of either drugs or major alcohol or something." When asked how the woman broke in, the citizen stated that he heard breaking glass, he was across the street, and she was halfway through the glass. He then said, "She's really lethargic, and I think she's probably under the influence of some alc- er, uh, some drugs." Later in the conversation, he said: "I asked her if she's okay, and she kinda looked at me kinda crazy, and she's not like really anger [sic] or anything, but she's like totally out of it. She's saying she's trying to get her keys out of there." The operator asked if the woman was still in the building, and the citizen answered: "I believe so, yes. She's kind of in the down basement part, and if she was to come back out, I would be able to see her." At about 5:25 p.m., Boise police officers were dispatched to the location of the dental office.

The first to arrive was Officer Butler, who arrived at the scene at about 5:30 p.m. The building was a single story office building with a basement. The basement had windows to the outside and long window wells, each of which served multiple basement windows. There were wrought iron railings to keep people from falling into the window wells.

Officer Butler met with the citizen, who was standing on the north side of the building. He reported that he had seen a woman break the window and enter the building and that he believed she was still in the downstairs part of the building. The officer walked to the northeast corner of the building to a point where he could see that a north-facing basement window had been broken out. He then relayed that information to the other responding officers.

As Officer Butler was looking for suspects, he saw a woman through an east-facing basement window at the northeast corner of the building. She was standing with her right side toward the window, and she had a large can of a malt liquor beverage in her left hand and what appeared to be a knife with a 4-5 inch blade in her right hand. She appeared to be rummaging through things on a workbench or table.[1] He observed her briefly, and she then walked out of view. The entire building was dark except the room in which he had seen her standing.

---

[1] In his report, Officer Butler wrote that the woman was "holding a Steele Reserve Malt liquor can in her left hand and manipulating several sharp dental instruments including a knife in her right hand." The Plaintiff testified that she did not have knives that she used or sharp instruments that look like knives. The citizen who called 911 testified in his deposition that he walked over to the window with Officer Butler when he arrived and he stood by Officer Butler at the window ten or fifteen seconds. During that time, the citizen stated that the woman was simply standing there drinking from a 24-ounce can of beer, that there was other beer on the countertop, and that he did not see anything else in her hands. The citizen said that he then walked away from the window because other officers were arriving and one had come up to Officer Butler. The citizen stated that he stood in the parking lot for about two minutes and then walked back to his grandfather's house.

2

Officer Barber and Sergeant Kukla arrived a few minutes after Officer Butler. Officer Butler told them what he had seen, that the suspect was still in the building, and that she was armed with some kind of an edged weapon. After additional officers arrived, they established a perimeter around the building.

Officer Barber telephoned one of the dentists who owned the building. The dentist came to the scene, and Officer Barber heard him state that no one should be in the building, especially no one who entered by breaking a window. The cleaning lady also came to the scene, and she told Officer Barber that a woman worked in the building. When she began to describe the woman, the dentist reiterated that anyone who had to break into the building was not supposed to be there, so the conversation ended.

At about 5:40 p.m., Sergeant Kukla requested a patrol canine. Officer Bonas, a police officer who was a canine handler, was told of that request when he came on duty at 6:00 p.m. He was informed that there was a request for a patrol canine for a burglary in progress at a dental office. He arrived at the dental office at about 6:10 p.m. and spoke with Officers Barber and Butler and Sergeant Kukla. Lieutenant Schoenborn was also there. Officer Bonas was informed that a witness had seen a woman force entry into the dental office by shattering a downstairs window. Officer Butler stated that he had seen the woman through a window and that she was armed with a knife. Sergeant Kukla and Officer Barber stated that the owner of the business was there and informed them that no one should be inside the building. Officer Bonas went to the northeast corner of the building and saw the broken window. He also observed that the entire upstairs and the majority of the downstairs were dark. He then decided that the use of a police dog was reasonable and necessary and the safest way to search for the suspect in the building.

Officer Bonas made the initial decision to use a police dog to find the suspect or suspects in the building. The factors he considered were: that the crime involved was burglary, a felony; burglaries at other local dental offices had occurred that month; one suspect had been seen armed with a knife; dental offices contain nontraditional weapons; the suspect(s) would have the tactical advantage of concealment and could be lying in wait in the dark; Officer Butler had used the public address system in a police car to announce to the suspect inside the building that they were police officers, that if the suspect did not surrender they would use a police dog, and that

they may be bitten;[2] and that using a police dog would be safer than having officers search the building, because the officers would have their guns drawn, increasing the danger to all parties involved. Lieutenant Schoenborn, as watch commander, discussed the use of the dog with Sergeant Kukla, and then authorized Officer Bonas to deploy the dog.

Officer Bonas then took the dog out of his car and proceeded to the front door of the building, accompanied by Sergeant Kukla and Officers Barber, Rapp, Butler, and Harr. Officer Barber unlocked the door using a key that had been obtained from either the dentist or the cleaning lady. Officer Bonas announced in a loud voice through the open door: "Suspect in the building. Boise Police canine calling out. Surrender. If you do not surrender—[barking]. Heel. If you do not surrender a police dog will be sent. When he finds you, he will bite you. This is your final warning [barking]."[3] There was no response from inside the building, so the officers entered and began searching the ground floor.

After about two minutes, they stopped near the top of the stairs going to the basement. Officer Bonas then made a second announcement, stating in a loud voice: "Attention in the building. Boise Police canine calling out. Surrender. If you do not surrender, a police dog will be sent, and when he finds you he will bite you. This is your final warning." There was no response.

They then continued searching the ground floor part of the building, which took about six minutes. They again stopped at the top of the stairs going to the basement. Officer Bonas made a third announcement, stating in a loud voice: "Suspect downstairs. Boise Police canine calling out. Surrender. If you do not surrender, a police dog will be sent. When he finds you, he will bite you. This is your final warning." There was no response.

---

[2] Officer Bonas testified that Officer Butler used the public address system in a patrol car to make the announcement before the entry team walked up to the front door of the building. Officer Butler testified that he made the announcement from his patrol car and that he thought he did so at least ten minutes before the dog entered the building. Officer Barber testified that he moved his patrol car from where he had initially parked it so that the public address system in the car could be used to make an announcement, but he did not specifically recall whether the announcement was made. Officer Harr testified that she thought Officer Butler made an announcement using the public address system of his patrol car prior to entry into the building. The citizen who called 911 testified that he did not hear any announcements from his grandfather's house, which was apparently across the street, but his grandfather had installed very expensive windows to decrease the sound because he lived on a very busy street. He testified that he could hear sirens inside his grandfather's house, but there was no evidence that the decibel rating of the patrol car's public address system was comparable to the decibel rating of a siren, which is required to be "a decibel rating of at least one hundred (100) at a distance of ten (10) feet." I.C. § 49-623(3).

[3] Officer Bonas had an audio recording device on his person.

Officer Bonas then decided to send the police dog down the stairs into the basement. He could tell that there was a light on downstairs and that the sides of the stairs were walled, not open, so there was a blind corner at the bottom of the stairs. He released the dog from his leash, and the dog went down the stairs. The officers remained at the top of the stairs. After a while, the dog began barking, indicating that he smelled the odor of a human. Because the human odor could be carried by air movement up a wall, across the ceiling, and down on the other side of a room, locating the odor would not mean that the person was located. Officer Bonas then gave the dog a command to bite, which would cause the dog to use his eyes and ears to find a person. After a few seconds, Officer Bonas heard a female screaming from the basement.

He headed down the stairs with the other officers following him. At the bottom of the stairs he turned to the left and saw a bathroom door that was open about seven or eight inches. The screams were coming from the bathroom, and he could see a human torso and the police dog inside the bathroom. The bathroom door then closed. Officer Rapp, who had a shield that he could use for protection, pushed the door open. The interior of the bathroom was dark without any light on, but Officer Bonas could see that the police dog was biting the woman's right arm. She was lying on the floor. He yelled at her to show her hands, but she did not comply. He then commanded the dog to release and lie down, and he did. Once the dog released, Officer Bonas left the bathroom and moved with the dog to a hallway where he could cover the other officers.

Officer Harr, a female officer, was behind Officer Bonas when the bathroom door was opened. She saw a female lying on the floor. Her pants were pulled down past her knees, and she was wearing a T-shirt. Officer Harr helped pull the woman's pants up. She described the woman as being "completely out of it. Intoxicated." She stated that the woman "was completely lethargic, just slumped over, like completely out of it." After the woman was removed from the bathroom, Officer Harr, Officer Bonas, and other officers continued searching the remainder of the basement, but found no other suspects. The woman was taken first to paramedics who were posted nearby and then to the hospital. Testing at the hospital revealed that she had a blood alcohol content of 0.27. The woman was later identified as Melene James, the Plaintiff.

The basement of the building had been leased to a man who operated a dental laboratory making crown bridges. Beginning on January 1, 2010, the Plaintiff began using a small corner of the lab pursuant to an oral agreement with the man that she would help him as needed in exchange for him permitting her to use the laboratory to make orthodontic appliances in her own

5

business. The Plaintiff lived in an apartment located about one-half block from the dental building. At about 4:00 p.m. on December 26, 2010, a neighbor had called her, told her that a tooth had fallen out of his denture and that he had an important meeting the next day, and asked if she could repair the denture that day. She agreed to do so. He gave her the denture, and she walked to the dental building to make the repairs. There was a cement stairway outside the building providing access to the basement. She had a key to the door, and she walked down those stairs, unlocked the door, and entered the basement. It took her about 20 to 30 minutes to make the repairs, but she then had to let the acrylic cure for about 30 minutes. While it was curing, she walked out the basement door to have a cigarette. Once she was ready to return to her work, she realized that the door had locked behind her and her keys and cell phone were inside the building. There was a basement window that was sometimes left unlocked, so she walked up the stairs to where that window was and climbed over the wrought-iron railing and down into the window well. As she was trying to open the window, she accidently broke it. She had equipment running that could be a fire hazard, and so she decided to crawl through the broken window. While she was doing so, the citizen approached and asked if she needed any help. Once inside the building, she did not telephone the man who was permitting her to use the basement because she was afraid he would become upset and not allow her to use the laboratory any more. She opened the refrigerator to get some water and saw the can of malt liquor. She decided to drink it in order to calm down before calling him. She also did not attempt to contact either of the dentists who owned the building.[4] She began doing the work to finish repairing the dentures, and then went to the bathroom. She closed the door, but may not have latched it. That is the last thing she remembers. She did not hear the officers, the announcements to surrender or she would be bitten by a dog, or the dog barking in the basement just before it bit her.

On October 4, 2012, the Plaintiff filed this action against Officers Bonas and Butler, and Sergeants Kukla and Likes (herein "the Police") and City of Boise. Sergeant Likes had not been at the scene and had no involvement in what occurred, but he was the patrol supervisor for the four patrol dogs. The Plaintiff alleged that the Defendants violated the Idaho Tort Claims Act by committing the torts of assault, battery, false arrest, wrongful imprisonment, and intentional

---

[4] The Plaintiff testified in her deposition that she did not know the dentists' telephone numbers, but she did not testify that she made any attempt to locate their numbers. Officer Barber testified in his deposition that he telephoned the dentist who later arrived at the scene and that he obtained the dentist's telephone number from the side of the building.

infliction of emotional distress and by negligently failing to train, supervise, and control the police dog, allowing him to repeatedly bite Plaintiff. She also alleged a claim under 42 U.S.C. § 1983, asserting that the Defendants violated her rights under the Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States by entering and searching the laboratory where she worked, by seizing her, and by using excessive force in arresting her.

The Defendants moved for summary judgment, and, after the motion was briefed and argued, the district court issued a memorandum decision and order granting the motion. It held that the Defendants were entitled to qualified immunity with respect to the federal claims; that pursuant to Idaho Code section 6-904 they were not liable under the Idaho Tort Claims Act for the alleged intentional torts; and that the Plaintiff had failed to present evidence showing a negligent failure to train, supervise, or control the police dog. The court entered a judgment dismissing all of the Plaintiff's claims with prejudice. She filed a motion for reconsideration and later a notice of appeal. After briefing and argument on the motion, the court entered an order denying the motion for reconsideration.

## II.
**Did the District Court Err in Holding that the Police Were Entitled to Qualified Immunity with respect to the Federal Claims?**

The Plaintiff sued under 42 U.S.C. § 1983, which supplies a remedy for the deprivation under color of state law of federally protected rights. By the time of the hearing on the motion for summary judgment, the Plaintiff stated that her federal claim was that the Police unconstitutionally used excessive force by using a police dog to seize her.

This case was decided by the district court granting the Defendants' motion for summary judgment. In an appeal from a summary judgment, this Court's standard of review is the same as the standard used by the trial court in ruling on a motion for summary judgment. *Infanger v. City of Salmon*, 137 Idaho 45, 46-47, 44 P.3d 1100, 1101-02 (2002). All disputed facts are to be construed liberally in favor of the non-moving party, and all reasonable inferences that can be drawn from the record are to be drawn in favor of the non-moving party. *Id.* at 47, 44 P.3d at 1102. Summary judgment is appropriate if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Id*. If the evidence reveals no

disputed issues of material fact, then only a question of law remains, over which this Court exercises free review. *Id*.

The district court granted summary judgment with respect to the claim under 42 U.S.C. § 1983 on the ground that there was no constitutional violation because, under the circumstances in this case, the use of a police dog to find and seize the Plaintiff was objectively reasonable. The court also held that even if there was a constitutional violation, the Police were entitled to qualified immunity because using a police dog to find and seize the Plaintiff did not violate a constitutional right that was clearly established on the date of this incident.

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, ___ U.S. ___, ___, 131 S.Ct. 2074, 2080 (2011). "[C]ourts have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first." *Id*. Addressing the second prong first is consistent with the general rule of avoiding constitutional questions when the case can be decided on other grounds. *Pearson v. Callahan*, 555 U.S. 223, 241 (2009). Therefore, we will address the second prong.

In the district court, the Plaintiff asserted that "[t]he clearly established right at issue here is a citizen's right 'to be free from excessive use of force under the facts and circumstances presented in this case.'" She argued that "no force was necessary because had the officers evaluated the totality of circumstances it was highly likely that they would have discovered who she was and why she was there." Relying upon our decision in *Miller v. Idaho State Patrol*, 150 Idaho 856, 252 P.3d 1274 (2011), the district court held that the Plaintiff defined the clearly established law at issue too generally. As we stated in *Miller*:

> The first component of this analysis is defining the relevant legal rule at stake. The Court should not define the right too generally, as doing so would essentially vitiate the qualified-immunity doctrine. Here, for example, it would not be helpful to simply ask whether police must not execute unreasonable searches or, as Appellants suggest, whether the police can obtain bodily fluid from a person reasonably suspected of driving under the influence. Warrantless blood draws and voluntary urine samples are significantly less intrusive than warrantless forcible catheterizations. *Instead, the question should reflect the factual specifics in this case.*

*Id*. at 865, 252 P.3d at 1283 (citation omitted; emphasis added). The district court held that "the inquiry should be whether a reasonable police officer would have known as of December of 2010 that it was unlawful to utilize a police dog to search for and bite and seize a hidden and potentially armed suspect during a burglary in progress." Citing three decisions from the Ninth Circuit Court of Appeals, the district court held that there was no clearly established law prohibiting the use of a police dog to find and seize a burglary suspect.

The court first cited *Chew v. Gates*, 27 F.3d 1432 (9th Cir. 1994), in which, during the early afternoon on September 4, 1988, a suspect stopped for a traffic violation fled on foot into a scrapyard, where he hid. *Id*. at 1436. Upon discovering that there were three outstanding warrants for the suspect's arrest, the officer radioed for assistance. *Id*. The police set up a perimeter around the scrapyard, and a helicopter and canine units were called to assist in the search. *Id*. About one and one-half hours after the suspect had fled, a police dog was unleashed into the scrapyard to find him. *Id*. at 1442. About thirty minutes later, the dog found and bit the suspect, but there was a factual dispute as to whether the suspect attempted to surrender prior to being bitten. *Id*. The court of appeals held that the defendants were entitled to qualified immunity with respect to the policy authorizing "the use against all concealed suspects of dogs trained to search for and apprehend persons by biting and seizing them." *Id*. at 1446. The court stated:

> When the incident that led to the filing of this lawsuit occurred [September 4, 1988], the use of police dogs to search for and apprehend fleeing or concealed suspects constituted neither a new nor a unique policy. The practice was long-standing, widespread, and well-known. No decision of which we are aware intimated that a policy of using dogs to apprehend concealed suspects, even by biting and seizing them, was unlawful. At the time of the incident in question, the only reported case which had considered the constitutionality of such a policy had upheld that practice. *See Robinette v. Barnes*, 854 F.2d 909 (6th Cir.1988) (holding that use of police dog trained to bite a suspect's arm or other available limb to apprehend a burglary suspect hiding in a darkened building was constitutional).

*Id*. at 1447.

The court next cited *Watkins v. City of Oakland*, 145 F.3d 1087 (9th Cir. 1998). In *Watkins*, on November 20, 1993, officers responding to a silent alarm at a commercial building released a police dog to find and bite the burglary suspect after announcing twice that the suspect should give up or the police dog would be released and the dog would find and bite the suspect.

9

*Id.* at 1090.  The suspect later sued, and the court of appeals held that the defendants were entitled to qualified immunity regarding the use of police dogs to bite and hold suspects.

> Following our prior decision in *Chew,* we agree with appellants that Oakland's "bite and hold" policy did not violate clearly established law concerning the use of excessive force at the time of the incident.  . . .  Although *Chew* was based on the law as it existed in September of 1988, there had been no change in the law that would have alerted [the canine officer] that his use of a police dog to search and bite was unconstitutional.

*Id.* at 1092.

The third case cited by the court was *Miller v. Clark County*, 340 F.3d 959 (9th Cir. 2003).  In *Miller*, during the night of January 21, 2001, an officer used a police dog to find and bite a suspect who had fled at night from his parents' house across their large rural property into some dense, dark, wooded terrain.  *Id.* at 960-61.  The suspect was wanted for the felony of fleeing from police by driving a car with a wanton or willful disregard of the lives of others.  *Id.* at 960.  The court of appeals held that "use of a police dog to bite and hold Miller until deputies arrived on the scene less than a minute later was a reasonable seizure that did not violate Miller's Fourth Amendment rights.  . . .  Notwithstanding the serious injuries to Miller, there was no use of excessive force under the circumstances."  *Id.* at 968 (citation omitted).

Based upon these opinions, the district court held that "there was no clearly established law proscribing the use of police dogs under circumstances presented to the officers here."  It therefore held that the Police were entitled to qualified immunity.

On appeal, the Plaintiff argues that "[t]he district court was critical of [the Plaintiff] for failing to articulate a narrowly and clearly defined constitutional right of which objectively reasonable police officers would be aware."  According to the Plaintiff, "That, of course, is a self-defeating proposition for any litigant, plaintiff or defendant, because it forces the litigant to guess what the court deems specifically narrow enough to fit whatever undefined parameter it will ultimately use."  Thus, she asserts that the clearly established right at issue should be that she "had the basic and fundamental right not to be attacked by a police dog simply because she was mistaken for a burglar by overzealous police officers."  This formulation of the issue is clearly wrong.  It assumes that the Police knew that the Plaintiff was "mistaken for a burglar." The circumstances are not to be judged "with the 20/20 vision of hindsight."  *Graham v. Connor*, 490 U.S. 386, 396 (1989).  There is no constitutional right not to be mistaken for a criminal.

10

"The Constitution does not guarantee that only the guilty will be arrested." *Baker v. McCollan*, 443 U.S. 137, 145 (1979). "The Fourth Amendment is not violated by an arrest based on probable cause, even though the wrong person is arrested." *Graham*, 490 U.S. at 396.

The issue in this case is the use of a police dog to find and subdue by biting a suspected burglar in a dark basement after the suspect failed to respond to police announcements stating to surrender or a police dog would be sent that would find and bite him or her. The clearly defined law has to focus upon the use of the police dog under the circumstances of this case. For example, in *Watkins* the Ninth Circuit Court of Appeals stated:

> Although the use of excessive force in effecting an arrest is a clearly established violation of the Fourth Amendment, Watkins' legal right cannot be so general as to allow him to "convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights."

145 F.3d at 1092.

As shown above, in *Chew* the Ninth Circuit Court of Appeals stated, "No decision of which we are aware intimated that a policy of using dogs to apprehend concealed suspects, even by biting and seizing them, was unlawful." 27 F.3d at 1447. In *Watkins*, the Ninth Circuit held, "Although *Chew* was based on the law as it existed in September of 1988, there had been no change in the law that would have alerted [the canine officer] that his use of a police dog to search and bite was unconstitutional." 145 F.3d. at 1092. Finally, in *Miller* the ninth circuit held that "use of a police dog to bite and hold Miller until deputies arrived on the scene less than a minute later was a reasonable seizure that did not violate Miller's Fourth Amendment rights." 340 F.3d. at 968. The Plaintiff has not cited any authority to the contrary, and the decisions of the ninth circuit on this issue are the controlling authority unless the Supreme Court decides otherwise. It is not sufficient merely to say that the use of a police dog to bite and hold a suspect constitutes excessive force, because there is no clearly established controlling authority so holding.

The Supreme Court has made it clear that the clearly established law at issue must take into account the factual circumstances facing the officers. In *Anderson v. Creighton*, 483 U.S. 635 (1987), the defendant and other state and federal law enforcement officers conducted a warrantless search of the plaintiffs' home because they thought that a man who had committed a bank robbery earlier in the day was there. *Id*. at 637. The plaintiffs sued, and the defendant

11

moved to dismiss on the ground that the plaintiffs' claim was barred by qualified immunity. *Id*.
The federal district court dismissed the case on the ground that there was probable cause to believe the bank robber was there and that exigent circumstances justified the warrantless search. *Id*. On appeal, the court of appeals reversed, holding that there were issues of fact as to whether the search was supported by probable cause and exigent circumstances and that the defendant was not entitled to qualified immunity because "the right of persons to be protected from warrantless searches of their home unless the searching officers have probable cause and there are exigent circumstances—was clearly established." *Id*. at 637-38.

The Supreme Court vacated the opinion of the court of appeals because it had misapplied the law with respect to identifying the applicable clearly established law for determining whether there was qualified immunity. The Court explained why the "clearly established law" could not be so general that it would eliminate the rule of qualified immunity. It stated:

> For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right. Much the same could be said of any other constitutional or statutory violation. But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of *Harlow* [*v. Fitzgerald*, 457 U.S. 800 (1982)]. Plaintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights. *Harlow* would be transformed from a guarantee of immunity into a rule of pleading.

*Id*. at 639.

The Court explained that "the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id*. In deciding whether an action violated clearly established law, the focus must be whether the officials objectively reasonably believed that their action was lawful under the circumstances of the particular situation. The Court stated that the error made by the court of appeals was that it "specifically refused to consider the argument that it was not clearly established that the circumstances with which [the defendant] was confronted did not constitute probable cause and exigent circumstances." *Id*. at 640-41. The Court stated that the relevant

12

question in the case was, for example, "the objective (albeit fact-specific) question whether a reasonable officer could have believed [the defendant's] warrantless search to be lawful, in light of clearly established law and *the information the searching officers possessed*." *Id*. at 641 (emphasis added).

Likewise, in *Pearson v. Callahan*, 555 U.S. 223 (2009), officers conducted a warrantless search of the plaintiff's house after an undercover informant, whom the plaintiff had voluntarily admitted into the house, signaled them that he had just purchased methamphetamine from the plaintiff. *Id*. at 227. The district court held that the officers were entitled to qualified immunity because they reasonably believed that they could lawfully enter pursuant to the " 'consent-once-removed' doctrine, which permits a warrantless entry by police officers into a home when consent to enter has already been granted to an undercover officer or informant who has observed contraband in plain view." *Id*. at 229. On appeal, the court of appeals reversed, holding that the clearly established law at issue was " 'the right to be free in one's home from unreasonable searches and arrests' " and that "under the clearly established precedents of [the Supreme] Court and the Tenth Circuit, 'warrantless entries into a home are per se unreasonable unless they satisfy the established exceptions.' " *Id*. at 230. The court of appeals then held that the officers could not reasonably have believed that their conduct was lawful because they knew they did not have a warrant, the plaintiff had not consented to their entry, and his consent to the informant's entry could not reasonably be interpreted to include the officers. *Id*.

On appeal, the Supreme Court reversed, holding that the officers were entitled to qualified immunity because their conduct did not violate clearly established law. *Id*. at 243. The Court held that "[w]hen the entry at issue here occurred in 2002, the 'consent-once-removed' doctrine had gained acceptance in the lower courts," which consisted of three federal courts of appeals and two state supreme courts. *Id*. at 244. It had been accepted by each of those courts, and the seventh circuit had approved application of the doctrine in cases in which private citizens were acting as confidential informants. *Id*. The Court held that the officers were entitled to rely upon those cases even if their own federal circuit had not yet ruled upon the "consent-once-removed" doctrine. *Id*.

Whether the law is clearly established is a question of law to be resolved de novo on appeal. *Miller*, 150 Idaho at 865, 252 P.3d at 1283. A plaintiff has the burden of establishing that the law was well established at the time of the violation. *Id.* "[W]hether an official

protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson*, 483 U.S. at 639 (citation omitted).

The decision as to whether the facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause is reviewed de novo on appeal. *Ornelas v. United States*, 517 U.S. 690, 696 (1996). In the instant case, the officers had probable cause to believe that there was a burglary in progress in the dental office.

A woman was seen crawling through a broken basement window into the building just after sunset on a Sunday, when the office was closed. A citizen witness stated that the woman appeared to be under the influence of alcohol or drugs and claimed to be retrieving her keys. An owner of the building arrived later and stated that no one should be in the building, especially anybody who had to break a window to enter. During the approximate forty minutes while the police were at the building, there was no indication that anyone attempted to contact the owner to report an accidental breakage of the window, and the woman inside the building did not respond to a police announcement using the public address system in a patrol car. The dental building had a ground floor and a basement. The interior of the ground level was dark, as was most of the basement. The woman had been seen in the lit portion of the basement very briefly, and then walked out of sight. Before commencing the search of the building, Officer Bonas announced in a loud voice at the open front door that they were the police, commanded the person inside to surrender, and warned that if the person did not surrender they would send in a police dog that would find and bite the person. There was no response. After searching the ground floor for about two minutes, Officer Bonas made another similar announcement in a loud voice. When doing so, he happened to be at the top of the stairs going down to the basement. Once the officers completed their search of the ground floor, they again stopped at the top the stairs. Officer Bonas made his third announcement in a loud voice, and there was no response from the suspected burglar. The stairwell down to the basement had walls on both sides. Although the landing at the bottom of the stairs was lit, Officer Bonas could not see whether there was anyone standing out of sight at the bottom of stairs. At that point, he decided to release the police dog to find the suspected burglar. The dog went down the stairs and soon started barking, indicating that he smelled human odor. There was no sound from the basement indicating that the person

14

down there wanted to surrender. At that point, Officer Bonas gave the command for the dog to find and bite the suspect.

The Plaintiff was not subjected to any force while the officers were searching the ground floor of the building. She was not seized until Officer Bonas gave the command for the dog to find and bite the suspect after the dog had smelled human odor while searching the basement. Therefore, the relevant issue is whether there was clearly established law that would have prohibited Officer Bonas from commanding the dog to find and bite the suspected burglar in the dark basement who had failed to respond to the calls to surrender. The Plaintiff does not cite any authority so holding. As the Ninth Circuit Court of Appeals stated in *Chew*, in 1988 the use of police dogs to search for and apprehend fleeing or concealed suspects was a long-standing, widespread, and well-known practice. 27 F.3d at 1447. The court stated, "No decision of which we are aware intimated that a policy of using dogs to apprehend concealed suspects, even by biting and seizing them, was unlawful." *Id*. Thus, there was no clearly established law holding that the Police conduct in this case constituted the use of excessive force.

The Plaintiff alleges that the officers violated department policy by not ascertaining whether there were any tenants in the building before entering it with the police dog and by failing to give an announcement while in the basement rather than from the top of the stairs. In making this argument, she cites *Brooks v. City of Seattle*, 599 F.3d 1018 (2010). In *Brooks*, the police tased a pregnant woman driver three times (on her thigh, shoulder, and neck) within a one-minute period of time after she refused to sign a traffic citation for speeding in a school zone and resisted police attempts to remove her from her car. *Id*. at 1020-21. The district court denied dismissal on the ground of qualified immunity, and the officers appealed. *Id*. at 1021. The three-judge panel of the court of appeals held that the officers had not used excessive force. In so holding, the panel stated as a consideration: "Here, there has been no departmental determination that the Officers could have used alternative methods. Indeed, the Officers followed the SPD's Use of Force Training Guideline, applying pain compliance techniques (of which drive-stun Taser use was one) to control an actively resisting suspect." *Id*. at 1029-30.

The *Brooks* court's consideration of whether the police followed department policy in their use of force is not relevant here for two reasons. First, that was a factor considered by the court in determining that "the Officers' behavior did not amount to a constitutional violation." *Id*. at 1031. It was not a factor in determining whether there was clearly established law that

15

their conduct violated a constitutional right. Indeed, the policies or guidelines adopted by the Boise Police Department do not give rise to a claim under 42 U.S.C. § 1983. "[T]he statute creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985). "Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law." *Baker*, 443 U.S. 137, 146 (1979).

Second, after the three-judge panel issued its opinion, the court of appeals heard the *Brooks* case en banc along with *Mattos v. Agarano*, another case involving the police use of a taser. In *Brooks*, the en banc panel came to a different conclusion than did the three-judge panel and held that "[a] reasonable fact-finder could conclude, taking the evidence in the light most favorable to Brooks, that the officers' use of force was unreasonable and therefore constitutionally excessive." *Mattos v. Agarano*, 661 F.3d 433, 446 (9th Cir. 2011). In reaching that decision, the en banc panel stated that it "must examine the totality of the circumstances and consider ' "whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham* [*v. Connor*, 490 U.S. 386 (1989)]." ' " *Id*. at 445. The appropriate factors that the en banc panel considered did not include any policies or guidelines adopted by the police department. That panel obviously did not consider them relevant in determining whether or not the officers used excessive force in violation of the Constitution.

The Plaintiff also contends that the district court failed to properly consider the affidavit of the Plaintiff's law enforcement expert.[5] The expert was critical of the conduct of the police in this case, but the expert's opinion is not clearly established law, even if that opinion had been given prior to the incident in this case. The clearly established law must be "controlling

---

[5] The Plaintiff's expert assumed that the Police "learned that there was a tenant relationship where persons other than the building owner had access and the right to be in the building." Officers Butler, Barber and Bonas were asked during their depositions whether they knew the basement was a dental lab prior to entering the building, and they testified that they did not. Sergeant Kukla testified in his deposition that he did not remember being told that the person had been seen in a dental lab prior to the police dog entering the building. Lieutenant Schoenborn testified in his deposition that he knew there was a dental lab in the basement before the police dog went into the building, but he stated that he did not recall how he received that information and was not advised that the person in the basement may have worked in the dental lab. There is nothing in the record indicating that the Police knew before entering the building that the basement had been leased to a tenant. The Plaintiff's expert was also critical of not having the cleaning lady give a description of the woman who worked in the building, but there is no evidence of what description she would have given and whether her description would have indicated that the Plaintiff may have been that woman.

16

authority" in the jurisdiction or "a robust 'consensus of cases of persuasive authority.' " *Ashcroft*, ___ U.S. at ___, 131 S.Ct. at 2084.

Although the *Brooks* decision did not address whether the officers violated any clearly established right when they tased Ms. Brooks, the *Mattos* decision did address that issue and held that "although Brooks has alleged an excessive force claim, the law was not sufficiently clear at the time of the incident to render the alleged violation clearly established." 661 F.3d at 448. Its analysis in arriving at that conclusion is instructive. It stated, "We begin our inquiry into whether this constitutional violation was clearly established by looking at the most analogous case law that existed when the officers tased Brooks in November 2004." *Id*. at 446.

The first case it considered was *Russo v. City of Cincinnati*, 953 F.2d 1036 (6th Cir.1992). In *Russo*, the police were called to help the family of Thomas Bubenhofer return him to a psychiatric institute. *Mattos*, 661 F.3d at 446. The call over the police radio described Bubenhofer as a walk-away from the psychiatric institute " 'who was "suicidal, homicidal, and a hazard to police." ' " *Id*. at 447. When the officers tried to get Bubenhofer out of his apartment, he threatened to kill anyone who entered his apartment and then opened the door and threatened the officers with two knives he was holding, one in each hand. *Id*. An officer tased him several times, to no avail, and he charged the officers while still holding the knives. *Id*. Ultimately, he was tased a final time while he lay at the bottom of the stairwell and posed no immediate threat to the officers. *Id*. The Sixth Circuit held that the initial use of the taser did not violate any clearly established law and that the subsequent tasings did not constitute excessive force. *Id*.

The second case that the *Mattos* court considered was *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir.1993). In that case, Hinton was initially stopped by the police for disturbing the peace, a misdemeanor, but he then pushed an officer after declining the officer's request to speak to him. *Mattos*, 661 F.3d at 447. When the officers informed Hinton that he was under arrest, he struggled by kicking his feet, flailing his arms, and biting the officers. *Id*. The officers tased him, and the Tenth Circuit held that Hinton failed to demonstrate that the officers' conduct amounted to a violation of the law. *Id*.

The third case that the *Mattos* court considered was *Draper v. Reynolds*, 369 F.3d 1270 (11th Cir.2004). In that case, a lone officer stopped a tractor-trailer truck at night because its tag light was not properly illuminated. *Mattos*, 661 F.3d at 447-48. During the traffic stop, the driver acted in an agitated and confrontational manner, paced back and forth, and yelled at the

officer. *Id*. at 448. After refusing the officer's fifth request to produce certain documents, the officer tased him. *Id*. The Eleventh Circuit held that the use of the taser to effectuate the arrest did not constitute excessive force. *Id*.

The *Mattos* court noted that the conduct of the persons tased in those three cases was significantly different from the conduct of Ms. Brooks. It was obvious that the circumstances in those cases were so dissimilar to those in *Brooks* that the decisions authorizing the use of a taser in those cases would not justify the use of a taser on Ms. Brooks. Unlike Bubenhofer in *Russo*, Ms. Brooks was not a paranoid schizophrenic, did not make suicidal and homicidal threats to the police, and did not overcome the effects of being tased multiple times in order to approach the officers with knives in her hands. *Id*. at 447. Unlike the plaintiff in *Hinton*, Ms. Brooks did not shove, kick, and bite the officers. *Id*. Unlike the circumstances in *Draper*, Ms. Brooks was immobile in her car during daylight and was outnumbered by the officers three to one. *Id*. at 448.

Even though the circumstances in each of those three cases were clearly factually distinguishable from the circumstances in which Ms. Brooks was tased, the court of appeals held that there was no clearly established law showing that what the officers did to Ms. Brooks constituted excessive force. The court of appeals stated, "We cannot conclude, however, in light of these existing precedents, that 'every "reasonable official would have understood" . . . beyond debate' that tasing Brooks in these circumstances constituted excessive force." *Id*. The court added, "Moreover, the violation was not so obvious that we can 'define clearly established law at a high level of generality,' finding that *Graham* [*v. Connor*, 490 U.S. 386 (1989)] alone renders the unconstitutionality of Brooks's tasing clearly established." *Id*. The court concluded "that, although Brooks has alleged an excessive force claim, the law was not sufficiently clear at the time of the incident to render the alleged violation clearly established." *Id*.

The existing case that is most similar to this case is *Watkins*, where officers responded to a silent alarm at a commercial warehouse. 145 F.3d at 1090. The officers saw someone running within the building, and they established a perimeter around the building. *Id*. There was no evidence as to whether the person was armed. *Id*. The officers decided to use a police canine to find, bite, and hold the suspect, and before doing so the canine officer twice announced: "This is the Oakland Police Department canine unit. Give yourself up or I'll release my dog who is going to find you and he is going to bite you." *Id*. When the suspect did not respond, the officer

18

released the dog. The dog ran out of sight and then found and bit the suspect. *Id*. With respect to qualified immunity, the court of appeals held that there was no clearly established law that the officer's "use of a police dog to search and bite was unconstitutional." *Id*. at 1092.

Even if there was some significant factual difference between *Watkins* and the present case, the *Mattos* case shows that the Police in this case were entitled to qualified immunity. In light of the Ninth Circuit decisions of *Chew*, *Watkins*, and *Miller*, it cannot be concluded that every reasonable official would have understood beyond debate that the conduct of the Police in this case violated a clearly established right of the Plaintiff. The Plaintiff has not cited a single case holding that the use of a police dog to find and subdue by biting a suspected burglar in a building constitutes excessive force. Absent a decision on the issue from this Court or the United States Supreme Court, the clearly established law is that of the Ninth Circuit, which holds that it does not. The district court did not err in granting summary judgment dismissing Plaintiff's claim under 42 U.S.C. § 1983 on the ground that the officers were entitled to qualified immunity.

**III.**
**Did the District Court Err in Dismissing the Federal Claims Against City of Boise?**

The district court dismissed the federal claims against City of Boise also. In *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), the United States Supreme Court held that while a municipality could not be held liable in an action brought pursuant to 42 U.S.C. § 1983 for the actions of its employees under the doctrine of respondeat superior, a municipality could be held liable under that statute if "official municipal policy of some nature caused a constitutional tort." *Id*. at 691.

During oral argument on the Defendants' motion for summary judgment, their counsel argued, in response from a question by the district court, that the Plaintiff had not alleged a claim against City of Boise. When the district court asked the Plaintiff's counsel about that, he answered:

> Yeah. Your Honor, I heard that, and I don't know what I pled. I don't have the complaint in front of me. Actually, I didn't even draft the complaint. I will tell you that I noted that in the summary judgment that there was not a *Monell* claim argued, and I didn't really think of that question one way or the other.

19

In its decision granting summary judgment, the district court stated that the Plaintiff "did make one passing allegation in her Complaint that might be read to encompass a *Monell* claim," but if such a claim was made it must be dismissed because there was no constitutional violation by the Police. In a footnote in its memorandum decision, the district court stated:

> In resisting the City of Boise's motion for summary Judgment [sic], plaintiffs [sic] offered no *Monell* analysis or argument whatsoever. While James did make one passing allegation in her Complaint that might be read to encompass a *Monell* claim, it was so vague and devoid of factual support and context specific to that claim such that it made it virtually impossible for Boise to meaningfully prove the absence of a question of fact relative to such a claim. Neither in the complaint nor at summary judgment has James pointed to an uncorrected repeated course of conducted [sic] depriving citizens of their right to be free from excessive force, nor did James identify how Boise has "implement[ed] or execute[d] a policy, statement, ordinance, regulation, or decisions officially adopted and promulgated by that body's officer." However, because the Court has found no constitutional violation, it need not determine whether a *Monell* claim against the City otherwise survives summary judgment.

In her motion for reconsideration, the Plaintiff did not contend that she had a *Monell* claim that the district court failed to recognize or consider.

In her brief on appeal, the Plaintiff asserts, "The District Court Erred in Dismissing Plaintiff's § 1983 Excessive Force ('Monell Claim') against the City of Boise." Her entire argument on that issue is as follows:

> Even though it acknowledged that the defendant's [sic] had not moved for summary judgment as to whether there was a Monell Claim against the City of Boise, the district court granted summary judgment anyway. Whether or not Plaintiff's complaint asserted a Monell Claim against the City of Boise was never at issue. Parties are not required to respond to issues which are not raised by the opposing party.

The Plaintiff does not contend that her complaint alleges a *Monell* claim against the city, nor does she point to any such alleged claim in her complaint. "We will not consider assignments of error not supported by argument and authority in the opening brief." *Hogg v. Wolske*, 142 Idaho 549, 559, 130 P.3d 1087, 1097 (2006). Therefore, we will not consider this issue.


## IV.
### Did the District Court Err in Dismissing the State Law Claims?


20

The Plaintiff alleged in her complaint that the actions of the Police constituted assault, battery, false arrest, wrongful imprisonment, and intentional infliction of emotional distress. As a general rule, the Idaho Tort Claims Act provides that a governmental entity is liable for money damages arising out of the negligent or otherwise wrongful acts of its employees committed in the course and scope of their employment or duties if a private person would be liable for such acts under the laws of this state. I.C. § 6-903(1).

**A. Assault, battery, false arrest, and wrongful imprisonment.** A governmental entity and its employees acting within the course and scope of their employment are not liable for any claim which arises out of assault, battery, false arrest, or false imprisonment if they were acting without malice or criminal intent. I.C. § 6-904. The district court held that the Defendants were not liable for these claims because there was no evidence that they acted with malice or criminal intent. On appeal, the Plaintiff contends that there is sufficient evidence that the Police acted with criminal intent.

The first issue to determine is the meaning of criminal intent in the Idaho Tort Claims Act. Idaho Code section 6-904(3) states:

> A governmental entity and its employees while acting within the course and scope of their employment and without malice or criminal intent shall not be liable for any claim which:
> . . . .
> 3. Arises out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights.

The Idaho Tort Claims Act applies only to tortious conduct—"negligent or otherwise wrongful acts or omissions." I.C. § 6-903(1). Therefore, Idaho Code section 6-904(3) lists types of conduct giving rise to tort liability, not criminal offenses. However, types of conduct listed in section 6-904(3) that could constitute a tort may also constitute a crime. For example, assault, battery, and false imprisonment are also crimes. I.C. §§ 18-901, 18-903, 18-2901.[6]

---

[6] Idaho Code section 18-901 defines the crime of assault as:

> (a) An unlawful attempt, coupled with apparent ability, to commit a violent injury on the person of another; or
> (b) An intentional, unlawful threat by word or act to do violence to the person of another, coupled with an apparent ability to do so, and doing some act which creates a well-founded fear in such other person that such violence is imminent.

Idaho Code section 18-903 defines the crime of battery as:

The Tort Claims Act does not define the term "criminal intent," and that phrase is not a term of art. It has various meanings, including the intent to do wrong; the mens rea for a particular crime, which may include criminal negligence; and the intent to violate the law, which implies knowledge of the law violated. Black's Law Dictionary 380-81 (7th ed. 1999).

This Court first addressed the meaning of that term in *Doe v. Durtschi*, 110 Idaho 466, 716 P.2d 1238 (1986). Several female students had filed lawsuits seeking damages from Durtschi, a fourth grade teacher, and the school district. *Id*. at 468-69, 716 P.2d at 1240-41. They alleged that Durtschi had sexually molested them during school hours and while conducting or supervising school activities. *Id*. at 469, 716 P.2d at 1241. Durtschi filed a cross-claim against the school district seeking indemnification. *Id*. The school district moved for summary judgment on Durtschi's cross-claim, and the district court granted the motion and entered judgment for the school district. *Id*. Durtschi then appealed. *Id*.

On appeal, this Court upheld the dismissal of Durtschi's cross-claim on the ground that he had acted with criminal intent. ***Id*. at 471, 716 P.2d at 1243**. In addressing the meaning of "criminal intent," we stated:

> The "criminal intent" provision "is satisfied if it is shown that the defendant knowingly performed the proscribed acts . . . ." *State v. Gowin*, 97 Idaho 766, 767–68, 554 P.2d 944, 945–46 (1976); *see also, e.g.*, *State v. Sisneros*, 631 P.2d 856, 858 (Utah 1981) ("A person acts with intent when it is his conscious objective or desire to engage in the conduct or to cause the result."). Ordinarily, criminal intent would be a question for the trier of fact. However, in this case Durtschi has left no doubt that he acted with criminal intent.
>
> Durtschi admitted to performing the lewd and lascivious acts on the minor plaintiffs. He specifically named each of the minor plaintiffs as the objects of his actions. He expressly stated that he acted intentionally. In the face of the school district's arguments that he acted with criminal intent, Durtschi made no denials. In fact, he pled guilty to related criminal charges of lewd and lascivious conduct. Every indication points to Durtschi knowingly and consciously performing criminal acts. We find nothing from which we can infer at all, much less reasonably infer, that Durtschi acted in any way but with criminal intent.

(a) Willful and unlawful use of force or violence upon the person of another; or
(b) Actual, intentional and unlawful touching or striking of another person against the will of the other; or
(c) Unlawfully and intentionally causing bodily harm to an individual.

Idaho Code section 18-2901 defines the crime of false imprisonment as "the unlawful violation of the personal liberty of another."

*Id*. at 470-71, 716 P.2d at 1242-43.

The definition of "criminal intent" stated in the above-quoted passage from *Durtschi* is not clear. First, the Court quoted the part of a sentence from *State v. Gowin*, 97 Idaho 766, 554 P.2d 944 (1976), that defines general criminal intent. The entire sentence was, "A general criminal intent requirement is satisfied if it is shown that the defendant knowingly performed the proscribed acts, but a specific intent requirement refers to that state of mind which in part defines the crime and is an element thereof." *Id.* at 767-68, **716** P.2d at 945-46 (internal citation omitted). The *Gowin* case involved a crime that required a specific intent, "fraudulent intent," and the Court held on appeal that there was insufficient evidence for the jury to find that the defendant possessed such intent. *Id*. at 767, **716** P.2d at 945.[7] However, the *Durtschi* Court also quoted the Utah Supreme Court's statement from *State v. Sisneros* that "[a] person acts with intent when it is his conscious objective or desire to engage in the conduct or to cause the result." 631 P.2d at 858. The Utah court made that statement when addressing whether there was sufficient evidence for a jury to find that an intoxicated defendant had the specific intent to commit a larceny when he broke into and entered a building at night in order for him to have committed the crime of burglary. Immediately following the quoted statement, the Utah court said, "Obviously, it is difficult to prove directly what is in a defendant's mind," *id*. at 858-59, and it concluded by stating, "Although defendant was under the influence of alcohol at the time of the commission of the offense, the jury could reasonably conclude that defendant maintained the requisite intent to burglarize the premises," *id*. at 860. Thus, the *Durtschi* Court quoted statements regarding both general intent and specific intent in defining "criminal intent." Finally, it stated: "Every indication points to Durtschi knowingly and consciously performing criminal acts. We find nothing from which we can infer at all, much less reasonably infer, that Durtschi acted in any way but with criminal intent." 110 Idaho at 471, 716 P.2d at 1243. The criminal acts committed by Durtschi required a specific criminal intent—"the intent of arousing,

---

[7] The criminal statute at issue stated:

> Every clerk, agent or servant of any person who fraudulently appropriates to his own use, or secretes with a fraudulent intent to appropriate to his own use, any property of another which has come into his control or care by virtue of his employment as such clerk, agent, or servant, is guilty of embezzlement.

I.C. § 18-2405 (1948).

23

appealing to, or gratifying the lust or passions or sexual desires of such person or of such minor or child."[8] Thus, when stating that Durtschi's conduct constituted "knowingly and consciously performing criminal acts," did the *Durtschi* Court mean that he knew that he was violating the law?

Most recently, in *Miller v. Idaho State Patrol*, 150 Idaho 856, 252 P.3d 1274 (2011), we addressed whether the Idaho Tort Claims Act afforded immunity to an officer, who had a nurse obtain a urine sample by the involuntary warrantless catheterization of a person arrested for driving under the influence of alcohol, despite the plaintiff's claim that the involuntary catheterization constituted a battery under Idaho Code section 6-904(3). In holding that it did, we stated: "Criminal intent 'is satisfied if it is shown that the defendant knowingly performed the proscribed acts.' . . . No shred of evidence suggests that [the officer] acted with malice or criminal intent." *Id*. at 870, 252 P.3d at 1288.

There is no difference between the intent necessary to commit the tort of battery and the intent necessary to commit the crime of battery. We stated in *Miller*, "Civil battery consists of an intentional contact with another person that is either unlawful, harmful, or offensive. Lack of consent is a critical element of battery." *Id*. at 869, 252 P.3d at 1287 (internal citation omitted). The crime of battery can be committed by the "[a]ctual, intentional and unlawful touching . . . of another person against the will of the other." I.C. § 18-903(b). Our statement that there was not a shred of evidence suggesting criminal intent must have meant that criminal intent was more than the mens rea necessary to commit the crime of battery.

Holding that "criminal intent" means only the mens rea of a crime comparable to the alleged tort would not be consistent with excluding from liability the torts of assault, battery, and false imprisonment. Therefore, "criminal intent" must mean something different from the mens rea for the comparable crime. In *Anderson v. City of Pocatello*, 112 Idaho 176, 731 P.2d 171 (1986), we stated that legal malice "involves the intentional commission of a wrongful or

---

[8] The statute provided:

> Any person who shall willfully and lewdly commit any lewd or lascivious act or acts upon or with the body or any part or member thereof of a minor or child under the age of sixteen years, with the intent of arousing, appealing to, or gratifying the lust or passions or sexual desires of such person or of such minor or child, shall be guilty of a felony and shall be imprisoned in the state prison for a term of not more than life.

Ch. 1 § 1, 1973 Idaho Sess. Laws 1, 1.

unlawful act without legal justification or excuse, whether or not the injury was intended" and that "[c]riminal intent closely equates to the above definition of 'legal' malice." *Id*. at 187, 731 P.2d at 182. We hold that "criminal intent" as used in the Idaho Tort Claims Act means the intentional commission of what the person knows to be a crime.

The district court correctly held that there is no evidence showing that the Police acted with criminal intent in this case. Therefore, the court did not err in dismissing the tort claims of assault, battery, false arrest, and wrongful imprisonment.

**B. Intentional infliction of emotional distress.** In order to establish a claim of intentional infliction of emotional distress, the plaintiff must prove that: (1) the defendant's conduct was intentional or reckless; (2) the defendant's conduct was extreme and outrageous; (3) there was a causal connection between the defendant's wrongful conduct and the plaintiff's emotional distress; and (4) the emotional distress was severe. *Edmondson v. Shearer Lumber Prods.*, 139 Idaho 172, 179, 75 P.3d 733, 740 (2003). The district court granted summary judgment against the Plaintiff on this claim on two alternative grounds: (1) "Nothing about Defendants' conduct could be considered extreme or outrageous in this context" and (2) "Surely the liability that James seeks to impose for intentional infliction 'arose out of' the conduct constituting the alleged false imprisonment, assault and battery. Simply 'changing the legal theory on which the claim for recovery' is based does not eviscerate the immunity otherwise provided."

On appeal, the Plaintiff challenges the first ground, but not the second. "[I]f an appellant fails to contest all of the grounds upon which a district court based its grant of summary judgment, the judgment must be affirmed." *AED, Inc. v. KDC Invs., LLC*, 155 Idaho 159, 164, 307 P.3d 176, 181 (2013). However, we note that a tort claim need only "arise out of" the type of conduct listed in Idaho Code section 6-904, which means it must originate or stem from such conduct. *Woodworth v. State ex rel. Idaho Transp. Bd.*, 154 Idaho 362, 365, 298 P.3d 1066, 1069 (2013). Immunity under the statute is not abrogated by changing the legal theory upon which a claim for recovery is sought. *Intermountain Constr., Inc. v. City of Ammon*, 122 Idaho 931, 933, 841 P.2d 1082, 1084 (1992).

**C. Idaho Code section 25-2808.** The Plaintiff also sought to recover under Idaho Code section 25-2808, which states:

25

Neither the state of Idaho, nor any city or county, nor any peace officer employed by any of them, shall be criminally liable under the provisions of section 25-2805, Idaho Code, or civilly liable in damages for injury committed by a dog when: (1) the dog has been trained to assist in law enforcement; and (2) the injury occurs while the dog is reasonably and carefully being used in the apprehension, arrest or location of a suspected offender or in maintaining or controlling the public order.

The district court held that the police dog was reasonably and carefully being used in this case when the dog located and bit the Plaintiff. She contends that the district court erred in so finding under the facts in the record. Plaintiff reads this statute as holding that the State of Idaho, a city or county, or a peace officer employed by any of them, could be civilly liable for damages for injury committed by a police dog assisting law enforcement in the apprehension, arrest, or location of a suspected offender, or in maintaining or controlling public order, if the dog is not "reasonably and carefully being used." She contends that there is an issue of fact as to whether the police dog in this case was being reasonably and carefully used. We affirm the judgment of the district court, but on a different ground.

The interpretation of a statute is a question of law over which we exercise free review. *City of Pocatello v. Idaho*, 152 Idaho 830, 838, 275 P.3d 845, 853 (2012). It must begin with the literal words of the statute, giving them their plain, obvious, and rational meaning, *Thomson v. City of Lewiston*, 137 Idaho 473, 478, 50 P.3d 488, 493 (2002); those words must be given their plain, usual, and ordinary meaning; and the statute must be construed as a whole, *State v. Hart*, 135 Idaho 827, 829, 25 P.3d 850, 852 (2001). If the statute is ambiguous, then it must be construed to mean what the legislature intended for it to mean. *Miller v. State*, 110 Idaho 298, 299, 715 P.2d 968, 969 (1986). To determine that intent, we examine not only the literal words of the statute, but also the reasonableness of proposed constructions. *Lopez v. State, Indus. Special Indem. Fund*, 136 Idaho 174, 178, 30 P.3d 952, 956 (2001).

The Plaintiff's interpretation of section 25-2808 would mean that an officer who uses a police dog to subdue a suspect in order to make the arrest would be subject to greater liability than an officer who shot the suspect in order to subdue him. The former would be subject to liability if the dog was not reasonably and carefully used, while the latter would only be subject to liability if the officer acted with malice or criminal intent. There is no logical reason why the legislature would intend that result. Likewise, the Plaintiff's interpretation would result in section 25-2808 impliedly amending the provisions in Idaho Code section 6-904(3) regarding

26

assault and battery when a police dog is being used. One standard (malice or criminal intent) would apply to a claim based upon an alleged assault or battery by peace officers who did not use a police dog and another standard (reasonably and carefully being used) would apply if the officers had used a police dog to subdue the suspect. Amending a statute by implication is disfavored and will not be inferred absent clear legislative intent. *Wilkins v. Fireman's Fund American Life Ins. Co.*, 107 Idaho 1006, 1008, 695 P.2d 391, 393 (1985).

Idaho Code section 25-2808 expressly refers to section 25-2805, and the proper interpretation of section 25-2808 requires consideration of that section, which states:

> (1) Any person, who, after complaint has been made by any person to the sheriff, who shall serve a copy of said notice upon such person complained of, willfully or negligently permits any dog owned or possessed or harbored by him to be, or run, at large without a competent and responsible attendant or master, within the limits of any city, town, or village or in the vicinity of any farm, pasture, ranch, dwelling house, or cultivated lands of another, or who willfully or negligently fails, neglects or refuses to keep any such dog securely confined within the limits of his own premises when not under the immediate care and control of a competent and responsible attendant or master, shall be guilty of an infraction punishable as provided in section 18-113A, Idaho Code.
>
> (2) Any dog which, when not physically provoked, physically attacks, wounds, bites or otherwise injures any person who is not trespassing, is vicious. It shall be unlawful for the owner or for the owner of premises on which a vicious dog is present to harbor a vicious dog outside a secure enclosure. A secure enclosure is one from which the animal cannot escape and for which exit and entry is controlled by the owner of the premises or owner of the animal. Any vicious dog removed from the secure enclosure must be restrained by a chain sufficient to control the vicious dog. Persons guilty of a violation of this subsection, and in addition to any liability as provided in section 25-2806, Idaho Code, shall be guilty of a misdemeanor. For a second or subsequent violation of this subsection, the court may, in the interest of public safety, order the owner to have the vicious dog destroyed or may direct the appropriate authorities to destroy the dog.

The violation of section 25-2805 by a dog's owner or handler could possibly result in the owner or handler being held to be negligent per se, which would conclusively prove the first two elements for a cause of action in negligence, leaving only causation and damages to be proved by the injured person. *Obendorf v. Terra Hug Spray Co., Inc.*, 145 Idaho 892, 898, 188 P.3d 834, 840 (2008). A peace officer whose use of a police dog allegedly violated the statute could also risk being held negligent per se and also being held criminally liable. That is the obvious reason for the adoption of section 25-2808. It begins by stating that "[n]either the state of Idaho, nor

27

any city or county, nor any peace officer employed by any of them, shall be criminally liable under the provisions of section 25-2805, Idaho Code." That provision eliminates the risk of criminal liability. The remainder of section 25-2808 states that the state of Idaho, any city or county, and any peace officer employed by any of them are not "civilly liable in damages for injury committed by a dog" when two conditions are met. First, the dog must have been trained to assist in law enforcement. Second, the injury must occur "while the dog is reasonably and carefully being used in the apprehension, arrest or location of a suspected offender or in maintaining or controlling the public order." I.C. § 25-2808. This provision eliminates the application of negligence per se for a violation of section 25-2505 by the state of Idaho, any city or county, and any peace officer employed by them. "[A] statute that creates a civil cause of action cannot be the basis of a negligence per se claim. The statute creating the cause of action defines the conduct constituting the tort and the applicable standard of care." *Steed v. Grand Teton Council of the Boy Scouts of America, Inc*., 144 Idaho 848, 853, 172 P.3d 1123, 1128 (2007).

There is no indication that the legislature intended to eliminate the use of police dogs to bite and hold suspects. Indeed, if subsection (2) of section 25-2505 were applied to police dogs, it would permit peace officers to use each dog only once to find, bite, and hold a criminal suspect. Once a police dog bit a suspect, the dog could not be released from a chain to find or pursue another suspect. Considering that the use of police dogs to search for and apprehend fleeing or concealed suspects by biting them is neither a new or unique policy and that such policy can reduce the risk of injury to police in subduing suspects in order to arrest them, the legislature would have been clear had it intended to eliminate that policy. In fact, the statute contemplates the use of police dogs. Thus, the provisions regarding civil liability were apparently intended by the legislature to apply to persons other than the suspect who may be injured by a police dog. Because the Plaintiff was the suspected offender who the Police were using the police dog to locate and apprehend so that they could arrest, Idaho Code sections 25-2805 and 25-2808 do not apply to this case.

**D. Negligent failure to train.** In her complaint, the Plaintiff alleged that the Defendants negligently failed to train, supervise, and control the police dog. In support of their motion for summary judgment, the Defendants offered the testimony of Officer Randy Arthur, who was certified as a canine trainer for both detection dogs and patrol dogs in 2003 by Idaho Peace

Officer Standards and Training (POST). Officer Arthur was POST certified as a canine trainer for both drug detection dogs and patrol dogs in 2003, and at the time of the motion for summary judgment he was certified by POST through December 31, 2014, as trainer and evaluator for both drug detection and patrol dogs. He stated that the Boise Police Department canine unit trains every Tuesday and exceeds the industry standard of four hours of training per week and that he trained Officer Bonas and his canine in the use and application of department policies and procedures, which are within industry standards. Officer Bonas and his canine were certified by POST on March 4, 2010, passing all tests. Pursuant to Idaho Code section 19-5107, POST Council has promulgated rules for certifying patrol dogs, which is how the dog in this case was trained. The dog has to be trained to apprehend a suspect without contact and with contact. IDAPA 11.11.01.223.01 & .02. For apprehension without contact, the handler must release the dog to pursue a fleeing suspect, who then stops and stands still. The dog must, as predetermined by the handler, either return to the handler or stay and guard the suspect. IDAPA 11.11.01.223.01. For apprehension with contact, the handler must release the dog to pursue a fleeing suspect, who does not stop. The handler must send the dog to physically apprehend the suspect, and the dog must hold the suspect until verbally called off by the handlers. IDAPA 11.11.01.223.02. Officer Bonas's canine passed both tests. The district court granted summary judgment on the Plaintiff's claim of negligent training.

On appeal, the Plaintiff contends that the district court erred in rejecting the opinion of the Plaintiff's expert, who stated that in his opinion police departments should use the "bark and hold" method rather than the "bite and hold" method. POST made a policy decision to permit dogs to be trained and certified in the "bite and hold" method. The City of Boise police department made a policy decision to use only the "bite and hold" method. In answers to interrogatories, the City stated:

> The Boise Police Department Canine Unit trains its dogs and handlers under the "Handler Controlled" (HC) method, as opposed to the "Bark and Hold" (BH) method. Under the HC method, the police dogs are trained to bite or bark based on the direction of the handler. The Boise Police Department Canine Unit believes that the HC method is safer for the public, suspects, and our handler/officers.

There is a difference of opinion as to which method is the best policy. The Boise Police Department made a policy decision not to use the "bark and hold" method because it determined

29

that the "bite and hold" method was safer for the public, suspects, and the dog handlers. Idaho Code section 6-904(1) exempts from liability any claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function." "The discretionary function exception applies to governmental decisions entailing planning or policy formation." *Dorea Enterprises, Inc. v. City of Blackfoot*, 144 Idaho 422, 425, 163 P.3d 211, 214 (2007). The purpose of this exemption is "to limit judicial re-examination of basic policy decisions properly entrusted to other branches of government." *Id*. Therefore, that the Plaintiff's expert believes that the police department should have chosen the "bark and hold" method rather than the "bite and hold" method is irrelevant to the Defendants' liability in this case.

## V.
### Are the Defendants Entitled to an Award of Attorney Fees on Appeal?

The Defendants seek an award of attorney fees on appeal pursuant to 42 U.S.C. section 1988 and Idaho Code sections 12-117 and 12-121. We will address each statute individually.

**A. 42 U.S.C. section 1988.** 42 U.S.C. section 1988 provides that in an action brought pursuant to 42 U.S.C. section 1983, "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." The Plaintiff contends that attorney fees cannot be awarded under this statute unless the action was frivolous, unreasonable, or without foundation at the time the complaint was filed. The statute does not contain any such limitation. It permits the award of attorney fees to the prevailing party in the discretion of the court.

In *Hughes v. Rowe*, 449 U.S. 5 (1980), the Supreme Court held that attorney fees could not be awarded to a prevailing defendant in a case brought pursuant to 42 U.S.C. section 1983 unless the plaintiff's action was frivolous, unreasonable, or without foundation. *Id*. at 14. The appeal regarding the dismissal of James's claim under 42 U.S.C. section 1983 was totally without foundation.

In this case, we will award attorney fees against the Plaintiff on her claim based upon 42 U.S.C. section 1988. It was clear that her claim would be barred by qualified immunity under the clearly established law of the Ninth Circuit, and the Plaintiff did not cite any law to the contrary.

**B. Idaho Code section 12-117.** The Defendants seek an award of attorney fees under Idaho Code section 12-117(1), which provides that "in any . . . civil judicial proceeding involving as adverse parties a state agency or political subdivision and a person, . . . the court . . . shall award the prevailing party reasonable attorney's fees . . . if it finds that the nonprevailing party acted without a reasonable basis in fact or law." Because we have clarified the meaning of criminal intent under the Tort Claims Act and Idaho Code section 25-2508, we do not find that the Plaintiff brought this appeal regarding her state law claims without a reasonable basis in fact or law. Therefore, we will not award attorney fees under this section.

**C. Idaho Code section 12-121.** The Defendants seek an award of attorney fees under Idaho Code section 12-121. In normal circumstances, attorney fees will only be awarded under this statute when this court is left with the abiding belief that the appeal was brought, pursued or defended frivolously, unreasonably or without foundation. *Minich v. Gem State Developers, Inc.*, 99 Idaho 911, 918, 591 P.2d 1078, 1085 (1979). We have previously held that when determining whether an award of attorney fees can be made under section 12-121, "the entire course of the litigation must be taken into account" and attorney fees may not be awarded under that statute "if there is a legitimate, triable issue of fact . . . even though the losing party has asserted factual or legal claims that are frivolous, unreasonable, or without foundation." *Nampa & Meridian Irr. Dist. v. Wash. Fed. Sav.*, 135 Idaho 518, 524-25, 20 P.3d 702, 708-09 (2001). We have since rejected that "overly strict application" of section 12-121 and held that "[a]pportionment of attorney fees is appropriate for those elements of the case that were frivolous, unreasonable, and without foundation." *Idaho Military Historical Soc'y, Inc. v. Maslen*, 156 Idaho 624, 632, 329 P.3d 1072, 1080 (2014). Because the appeal regarding the Plaintiff's claims under state law was not brought or pursued frivolously, unreasonably, or without foundation, we will not award attorney fees under section 12-121 for defending against those claims on appeal. However, we will also award the Defendants attorney fees under Idaho Code section 12-121 for defending the Plaintiff's appeal of the dismissal of her claim under 42 U.S.C. section 1983.

## VI.
## Conclusion.

We affirm the judgment of the district court. We award Respondents costs on appeal and attorney fees in defending the claim under 42 U.S.C. section 1983 pursuant to 42 U.S.C. section 1988 and Idaho Code section 12-121.

Justices BURDICK, HORTON and Justice Pro Tem KIDWELL **CONCUR.**

J. JONES, Chief Justice, specially concurring and dissenting in part.

I concur in the Court's opinion, except for the award of attorney fees. Because we hold that qualified immunity supported the dismissal on summary judgment of James' claim under 42 U.S.C. § 1983, it was not necessary to consider the merits of that claim. Had there been no qualified immunity issue, I would have voted to vacate the district court's dismissal of James' excessive force claim. In my view, there were triable issues of fact that would have precluded summary judgment.

In its 48 page memorandum decision, the district court did a commendable job of analyzing and deciding the issues presented, with the exception of the excessive force claim. Instead of drawing inferences in favor of James, the court essentially discounted portions of her expert's opinion testimony and expressed disagreement with other portions.

James presented the affidavit of her expert, Dan Montgomery, in opposition to the Defendants' motion for summary judgment. Montgomery set out substantial professional qualifications in his affidavit, including a bachelor's degree in law enforcement, a master's degree in criminal justice administration, 52 years of experience in various law enforcement positions including 25 years as chief of police in Westminister, Colorado, work as a canine instructor and supervisor, a law enforcement expert in 24 legal actions between 1985 and 2013, and various training and teaching sessions. Montgomery reviewed numerous documents in the preparation of his affidavit. In his affidavit, he raised questions about the existence of probable cause and the need for the use of the magnitude of force employed by the officers. Among other things, he observed and opined:

(1)     "[I]t is unusual for females to commit forced entry burglaries and it is also rare that a person with the criminal intent to burglarize would continue the crime if they have been spotted and/or identified."

(2)     "Nighttime burglaries into office buildings which are closed for business do not typically involve lit rooms. Burglars typically prefer to operate in the dark using darkness and stealth to their advantage."

(3) "A reasonable officer would ask themselves why this person would still be in the exact area where she was seen entering, knowing she had been seen, and then take time to drink beer and use dental instruments (in a dental lab) if, in fact, she was intent on committing a burglary."

(4) "In my opinion, there is not any reasonable evidence to suggest that the suspect was an 'immediate' threat to the officers. The suspect was reported to be 'lethargic' and 'totally out [of] it', which does not imply that she was or would be an 'immediate' threat."

(5) "It is my opinion that the suspect was not 'actively' resisting arrest nor was she attempting to evade arrest by flight."

(6) "The International Association of Chiefs of Police, and the United States Department of Justice have, for many years, adopted the recommendation that a 'bark and hold' policy should be followed by those police departments who use canines to search for and apprehend suspects."

While one might not necessarily agree with these and other opinions expressed by Montgomery, they do not appear on their face to be unreasonable or lacking in credibility. However, the district court stated that Montgomery's "characterization of the events is conclusory and unduly favorable to James and ignores important and undisputed facts." Then, in response to Montgomery's observation that it is unusual for females to commit forced entry burglaries, the court stated, "Montgomery has offered no statistics supporting his contention that females generally do not commit burglaries and there is no justifiable reason to believe that women are not as capable as men in doing so." While the district court might be correct in saying that women are as capable of men to commit burglaries, that does not mean they engage in that line of work as often as men. And, it is true that Montgomery did not present statistics supporting his observation, but when have we required an expert with more than 50 years' experience in the field of his expertise to produce statistics backing up an observation? Quite frankly, even though I do not consider myself an expert on the types of crime committed by women, his observation does not seem unreasonable. In light of his obvious experience, it is probably supportable.

With regard to Montgomery's observation that it is rare for a burglar to continue the crime if they have been spotted and/or identified, the district court stated, "not all burglars immediately abandon their crime and take flight from the scene when spotted entering, particularly those whose thinking is significantly impaired by alcohol and/or drugs." Both the court and Montgomery may have valid points, but why quibble with the expert's opinion, which is based upon 52 years of training and experience, when considering a summary judgment? It is not the judge's role to argue with the expert if the expert's opinion is not inherently improbable.

33

With regard to Montgomery's observation that burglars typically preferred to operate in the dark and that burglars don't typically drink beer and use dental instruments while on the job, the court stated: "that [James] was in a lit room drinking a beer while handling dental instruments does not reasonable suggest she is 'working.' People do not generally drink while at work in a dental lab. . ." Montgomery's observations appear quite reasonable and should not have provoked disagreement on summary judgment.

With regard to Montgomery's opinion that James, being lethargic and totally out of it, did not present an immediate threat to the officers, the court stated, "The Defendant officers were entitled to assume James posed an immediate threat because the objective factors indicated she was armed with a bladed tool, intoxicated, and hidden within the basement of a largely dark building with which the officers were unfamiliar." The word "armed" was not the word used by Officer Steven Butler, who was the first officer on the scene. He testified that he was observing James through a window, that he was 6 to 8 feet from her at the time, that she was "holding a knife, and it appeared that she was drinking from a beer can." He specifically identified the can as "Steel Reserve 211" malt liquor, so he was obviously close enough to see the print on the can. And, he indicated that James was rummaging through things on a table that included several dental instruments. Butler's testimony would not tend to support the conclusion that James was hiding or "hidden." There is nothing in the record that would justify the rejection of Montgomery's opinion as to the potential threat James may have presented.

With respect to Montgomery's observation that the International Association of Chiefs of Police and the Justice Department have adopted the recommendation that a "bark and hold" policy should be employed for canine apprehension of suspects, the district court stated that, "He merely asserted as a conclusion, without offering proof, that the International Association of Chiefs of Police and the U.S. Department of Justice, have recommended 'bark and hold' model policies." This implies that Montgomery was obligated to offer the policies in evidence, which is something that an expert need not do. Montgomery states in the qualifications portion of his affidavit that he is a "life member" of the International Association of Chiefs of Police. He would certainly have the necessary credentials to speak to policies adopted by that organization.

While in private practice in the mid-1990's, I encountered a similar situation. My plaintiff's expert in an excessive force case under Section 1983 "was the chief of police for Bellevue, Washington for ten years, and had a total of twenty-nine years of continuous police

service." *Kessler v. Barowsky*, 129 Idaho 647, 652, 931 P.2d 641, 646 (1997). He had been a recognized police expert in numerous cases and had reviewed all of the pertinent documents in the *Kessler* case. *Id.* at 652−53, 931 P.2d at 646−7. The expert testified, among other things, that the defendants in *Kessler* employed a flawed plan to seize the suspect and continued to use deadly force when it was no longer objectively reasonable. *Id.* at 652, 931 P.2d at 646. The district court denied the defendants' motion to strike the expert's affidavit but nevertheless granted them summary judgment dismissing the complaint. *Id.* This Court held that Kessler's expert "is qualified by knowledge and experience to assist the trier of fact with specialized knowledge on this subject." *Id.* We further concluded "that the material the expert reviewed and his qualifications as a law enforcement expert provide a sufficient foundation for his expert opinion on police procedures, including the assessment of dangers." *Id.* The Court did strike certain portions of the affidavit relating to the reactions that a Vietnam combat veteran might have in an arrest situation because the expert did not state his qualifications to opine as to the possible reactions of a Vietnam combat veteran. *Id.* Nevertheless, based upon the opinions of the expert regarding excessive use of force, which were supported by his law enforcement credentials, the Court vacated the summary judgment dismissing the Section 1983 claims and remanded the case for further proceedings. *Id.* at 657, 931 P.2d at 651.

In this case, the district court had no basis for discounting or quibbling with Montgomery's opinions. Montgomery provided adequate foundation and performed a thoughtful analysis that should have been taken into account by the district court in determining whether summary judgment was appropriate on the excessive force claim.

In my estimation, Respondents are not entitled to an award of attorney fees for defending Plaintiff's appeal of her section 1983 claim, either under section 1988 or Idaho Code section 12-121, and I dissent only with respect to the fee award.